UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KEVIN JOHN O'BRIEN,                          :
                                             :
                              Plaintiff,     :
                                             :           **OPINION AND ORDER**
              -against-                       :              13-CV-91 (DLI)
                                             :
CAROLYN W. COLVIN,                           :
Acting Commissioner of Social Security,      :
                                             :
                              Defendant.     :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

On March 8, 2010, Plaintiff Kevin John O'Brien ("Plaintiff") filed an application for

Social Security disability insurance benefits ("DIB") under the Social Security Act (the "Act"),

alleging disability beginning on October 12, 2002 through June 30, 2009, the date last insured.

(*See* Certified Administrative Record ("R."), Dkt. Entry No. 17 at 10.)  On July 16, 2010, his

application was denied and he timely requested a hearing.  (R. 130-131.)  On October 12, 2011,

Plaintiff appeared with counsel, and testified at a hearing via video teleconference before

Administrative Law Judge Hilton R. Miller (the "ALJ").  (R. 97-114.)  By a decision dated

October 25, 2011, the ALJ concluded Plaintiff was not disabled within the meaning of the Act.

(R. 7-19.)  On November 7, 2012, the ALJ's decision became the Commissioner's final decision

when the Appeals Council denied Plaintiff's request for review.  (R. 1-6.)

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. § 405(g).  (*See* Complaint ("Compl."), Dkt. Entry No. 1.)  The Commissioner

moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, seeking affirmation of the denial of benefits.  (*See* Mem. of Law in Supp. of Def.'s

Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 13.)  Plaintiff cross-moved for

judgment on the pleadings, seeking reversal of the Commissioner's decision, or alternatively, remand. (*See* Mem. in Opposition to Def.'s Mot. for J. on the Pleadings and in Supp. of Pl.'s Cross Mot. ("Pl. Mem."), Dkt. Entry No. 15.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's motion for judgment on the pleadings is denied. The instant action is dismissed.

## BACKGROUND

### A. Non-Medical and Self-Reported Evidence

#### 1. Work History

Plaintiff was born in 1953.[1] (R. 170.) He completed three years of college, and graduated from the Fire Academy in 1981. (R. 195.) Plaintiff worked as a firefighter for the New York City Fire Department ("FDNY") for twenty-one years, retiring in October 2002. (R. 100-101.) On March 23, 2010, while his DIB application was pending, Plaintiff submitted a Work Activity Report for a Self-Employed Person. (R. 186-189.) Plaintiff indicated that, after retiring from the FDNY, he worked as a convention consultant for firefighter trainings that occurred twice a year. (*Id.*) For each convention, he served as an organizer and worked approximately six days. (R. 186-187.) His annual gross salary for the conventions was $1,800.00 and he reported earnings for the years 2007 through 2009.

#### 2. Medical History

Plaintiff was a first responder to the World Trade Center ("WTC") terrorist attacks on the morning of September 11, 2001. (R. 13.) Plaintiff alleges that, due to his service at the WTC, he developed severe respiratory conditions that caused him to stop working as a firefighter. (*Id.*) Plaintiff testified that, when he retired from the FDNY in 2002, he "felt fine but as the years

---

[1] Plaintiff was 49 years old on the alleged onset date, October 12, 2002, and 55 on the date last insured, June 30, 2009. As such, Plaintiff was a "younger person" on his alleged onset date and "closely approaching advanced age" on the date last insured. 20 C.F.R. § 404.1563(c) and (d).

went further away from September 11 [he] started developing asthmatic and sinus conditions." (R. 13, 101.) He started treatment for his pulmonary conditions in 2004. (R. 103.)

Plaintiff alleges that, due to his conditions, he is unable to engage in any physical activity. (R. 204.) He is restless at night and sleeps during the day. (*Id.*) He feels winded and fatigued, and is unable to assist with household chores. (R. 205, 206.) Plaintiff has a driver's license and is able to drive his car for short distances. (*Id.*) He shops for light items for short periods of time. (R. 207.) Plaintiff is able to walk for ten minutes, but then must rest for three minutes. (R. 209.) During the day, Plaintiff prepares simple meals, takes his medications, attends doctor's visits, but mostly remains at home resting. (R. 102, 204-205.)

On February 18, 2010, the Medical Board of the FDNY ("FDNY Medical Board") granted Plaintiff's application for Accident Disability pursuant to the WTC Bill for a lower respiratory condition. (R. 310.) The FDNY Medical Board noted that Plaintiff's condition at the time (moderate chronic obstructive pulmonary disease ("COPD") with a bronchospastic component) would preclude full firefighting, but that he could engage in a "suitable occupation." (*Id*.) Subsequently, on March 24, 2010, Plaintiff's retirement status was modified to reflect his award of Accident Disability Retirement. (R. 161.)

Plaintiff testified that he suffers from weekly asthma attacks that last fifteen to twenty minutes. (R. 102.) These attacks remind him of trying to breathe "at a fire and [his] mask running out." (R. 103.) He also suffers from "minor attacks" during which he cannot stop coughing. (R. 102.) Plaintiff reported that the physicians who examined him tried "every combination" of inhalers, and that "some of them worked at certain times and some of them just don't." (R. 103.) Plaintiff testified that humidity, temperature changes, air conditioning, dust, and certain smells and perfumes aggravate his lung condition. (R. 102.)

**B.  Medical Evidence**

   **1.  Medical Evidence from the Relevant Period (October 12, 2002 to June 30, 2009)**

On June 27, 2004, Dr. David Prezant from the FDNY Bureau of Health Services clinic examined Plaintiff.  (R. 320, 334.)  Plaintiff reported that he spent nearly everyday at the WTC site until the site closed.  (*Id.*)  Plaintiff was an ex-smoker, and had started smoking again on September 11, 2001.  (*Id.*)  Plaintiff smoked about one pack of cigarettes every one to two days.  (*Id.*)  Plaintiff complained of a new dry, daily cough, gastroesophageal reflux disease ("GERD"), new significant sinus congestion and nasal drip, and wheezing in the morning hours.  He also mentioned that he coughed blood during the first month he worked at the WTC site.  (*Id.*)  Plaintiff denied taking any medications at the time.  His lungs were clear and his throat and heart were normal.  (*Id.*)  Plaintiff had lost weight due to diet and increased work.  (*Id.*)  Dr. Prezant's impressions were a sinus disorder and tracheitis.  (*Id.*)  He diagnosed Plaintiff with an unspecified respiratory disease and tracheitis.  (*Id.*)  Dr. Prezant recommended that Plaintiff attend a tobacco cessation program and prescribed him Rhinocort, Atrovent, and Doxycycline.  (*Id.*)

On July 2, 2004, Plaintiff underwent a pulmonary-function test, which showed that Plaintiff's forced expiratory volume ("FEV1") was 74% of the predicted value, and that Plaintiff's lung age was 82.  (R. 290.)  The results were interpreted as low vital capacity possibly due to restriction of lung volumes.  (*Id.*)  His electrocardiogram ("EKG") results were normal.  (R. 292.)  Plaintiff was diagnosed with skin cancer on this date.  (R. 319, 333.)  The doctor made no findings as to Plaintiff's work status.  (R. 319.)

On July 21, 2004, Plaintiff underwent a Methacholine bronchoprovocation study, which showed a reduced FEV1/forced vital capacity ("FVC") ratio, and reduced mid-expiratory

airflows.  (R. 379.)  The impression was obstructive airway dysfunction, with evidence for bronchial hyper-reactivity during Methacholine bronchoprovocation.  (*Id.*)

On July 25, 2004, Plaintiff was diagnosed with asthma/reactive airways dysfunction syndrome ("RADS"), and sinusitis.  (R. 318, 332.)  The FDNY Medical Board physician who examined Plaintiff counseled him to quit smoking, but Plaintiff decided to "[hold] off" until his wife's medical condition improved.  (*Id.*)  The physician prescribed Rhinocort, Benadryl, Advair, and Albuterol for attacks.  (*Id.*)  He discontinued Atrovent nasal spray.  (*Id.*)  The doctor noted that Plaintiff's "Current Duty Status" was full duty.  (R. 318.)

On August, 29, 2004, Dr. Prezant examined Plaintiff.  (R. 317, 331.)  Plaintiff's asthma was stable except during periods of humidity.  (*Id.*)  Dr. Prezant found that Plaintiff's lungs were clear, but that nasal congestion was still present despite Plaintiff's use of Rhinocort and Benadryl.  (*Id.*) Dr. Prezant discontinued Benadryl, continued Advair, Albuterol, Rhinocort, and restarted Atrovent.  (*Id.*)  Dr. Prezant noted that Plaintiff's "Current Duty Status" was full duty.  (R. 317.)  Dr. Prezant examined Plaintiff again on November 14, 2004, and noted that Plaintiff's asthma was stable, his lungs clear, his sinus congestion persistent, and that he was attending a smoking cessation program.  (R. 316, 330.)  He noted that Plaintiff's "Current Duty Status" was full duty.  (R. 316.)

On April 30, 2006, Plaintiff underwent a pulmonary-functioning test, which showed that his FEV1 was at 82% of the predicted value.  (R. 352.)  These results were interpreted as normal spirometry.  (*Id.*)  An EKG on the same date showed an ectopic atrial rhythm, which was borderline abnormal.  (R. 354.)  An x-ray of Plaintiff's chest was normal.  (R. 347.)  Plaintiff's lab testing showed higher than normal blood glucose, cholesterol, and LDL cholesterol levels.  (R. 349.)  Plaintiff's urinalysis showed mild abnormalities.  (*Id.*)  Lab testing conducted on April

6, 2007 showed higher than normal blood levels of microalbumin, LDL cholesterol, cholesterol, hemoglobin A1C, and glucose. (R. 249-251.)

On September 18, 2007, Dr. Jonathan Okun examined Plaintiff. (R. 252-255.) Dr. Okun noted that Plaintiff was diagnosed with diabetes mellitus in February 2007. (R. 254.) An eye examination revealed an established, stable, cortical cataract, which was asymptomatic and did not threaten Plaintiff's vision. (R. 255.)

An FDNY WTC Monitoring and Treatment Visit Summary Form dated September 20, 2007, listed asthma and sinusitis as Plaintiff's WTC-related diagnoses, and indicated that Plaintiff's treating doctor was Dr. Michael Weiden. (R. 343.) Dr. Weiden examined Plaintiff on the same date. (R. 315, 329.) Plaintiff reported cough, trouble breathing, and sputum production. (*Id*.) Dr. Weiden diagnosed Plaintiff with asthma/RADS and sinusitis. (*Id.*) He ordered a Computed Tomography Scan ("CT-scan") of Plaintiff's chest and a pulmonary-function test. (*Id*.) He prescribed Zithromicin and Combivent. (R. 315, 329, 343.)

On September 27, 2007, Plaintiff underwent a CT-scan of his chest, which showed mild diffuse bronchial wall thickening. (R. 340-341, 385-386.) Minimal mosaic attenuation was present in both lungs on expiration, which was most likely within physiologic limits. (R. 340, 285.) Very mild focal paraseptal emphysema was present at the right lung apex, and there was evidence of prior granulomatous disease, including a calcified nodule in the right upper lobe and calcified right paratracheal and hilar lymph nodes. (*Id.*) Focal atelectasis/scarring was present within the right upper lobe and inferior lingula, without evidence of endobronchial lesion. (R. 341, 386.) The exam showed a fatty liver and normal heart size. (R. 340-341, 385-386.) On the same date, Plaintiff underwent a pulmonary-function test, which showed vital capacity and total lung capacity within normal limits, increased residual volume suggesting air trapping, reduction

in airflow at all lung volumes, and minimal changes in expiratory airflow function following the administration of a bronchodilator. (R. 374.) The impression was obstructive airway dysfunction with air trapping, and no response to bronchodilator at the time of testing. (*Id.*)

On September 29, 2007, Plaintiff visited Dr. Weiden. (R. 314, 328.) Dr. Weiden diagnosed Plaintiff with asthma/RADS and sinusitis, and started Plaintiff on Advair and Flonase. (*Id.*) Dr. Weiden authorized a CT-scan of Plaintiff's sinuses. (*Id.*) On October 4, 2007 Plaintiff underwent a CT-scan of his sinuses, which showed nasal septal deviation with scattered, minimal to mild inflammatory disease in the paranasal sinuses and their respective drainage pathways. (R. 338-339, 387-388, 419-420.) Variations in the configurations of the drainage pathways could predispose Plaintiff to recurrent episodes of inflammatory disease. (R. 339, 388, 420.)

On October 25, 2007, Dr. John Dodaro, a physician with the FDNY, examined Plaintiff. (R. 263-265.) Plaintiff complained of tinnitus, chronic sinus infection, allergies, and earache. (R. 263). Plaintiff's allergy onset was gradual, chronic, and of mild to moderate severity. (*Id.*) Plaintiff described sinus pressure, aggravated by weather change. (*Id.*) Medications relieved Plaintiff's allergies. (*Id.*) At the time, Plaintiff also experienced postnasal drip, and complained of asthma, pharyngitis, eczema, dizziness, headache, hives, hoarseness, infections, earache, reflux, cough, sinus pain, and reddened eyes. (*Id.*) Plaintiff's bilateral earache was gradual, constant, and mild to moderate in severity, including pressure, ear popping, and congestion. (*Id.*) Plaintiff complained of "bleeding from ear, clear drainage, decreased appetite, dizziness, fever, purulent drainage, [and] decreased hearing and cough." (*Id.*) An ear examination revealed cerumen impaction in both ears. (R. 264.) Hearing was decreased in the left ear, and grossly intact in the right ear. (*Id.*)

During the same visit, a nose examination revealed nasal congestion, while throat and mouth examinations revealed change in voice and hoarseness.  (R. 263-264.)  A respiratory examination showed no cough, no audible wheeze, and regular respiration.  (R. 264.)  An endoscopy showed a septum that was deviated to the left, mucosa with a crusty discharge, and inferior turbinates that revealed moderate hypertrophy.  (R. 265.)  A laryngoscopy showed normal results.  (*Id.*)  Dr. Dodaro diagnosed Plaintiff with chronic allergic rhinitis, chronic sinusitis, chronic hypertrophy of the nasal turbinate, chronic impacted cerumen, chronic dysfunction of the eaustachian tube, chronic deviated nasal septum, chronic laryngitis, and chronic voice disturbance.  (*Id.*)  He prescribed Astelin and Medrol and ordered a follow up visit in three months.  (*Id.*)  Dr. Dodaro noted that Plaintiff was a tobacco user.  (R. 263.)

On November 19, 2007, Plaintiff saw Dr. Okun regarding his COPD and diabetes.  (R. 256.)  Dr. Okun noted that an FDNY physician examined Plaintiff for sinus problems and that Plaintiff was a tobacco user.  (*Id.*)  At this visit, Dr. Okun addressed uncontrolled allergic rhinitis and diabetes mellitus, the last of which, he noted, had improved.  (*Id.*)  A respiratory examination revealed no cough, no audible wheeze, and regular respirations.  (*Id.*)  Bilateral coarse breath sounds were present in both lungs on auscultation.  (R. 257.)  Plaintiff's eyes, nose, mouth, and throat were normal.  (*Id.*)  Dr. Okun assessed Plaintiff's uncontrolled allergic rhinitis, improved diabetes mellitus, hyperlipidemia, proteinuria, and cough.  (*Id.*)  With respect to Plaintiff's emphysema, Dr. Okun recommended a follow up visit with the FDNY physician.  (*Id.*)  Dr. Okun increased the dosages of Flonase and Metformin, prescribed Simvastatin, Chantix, Combivent, Advair, Glucophage, Nasonex, and replaced Diovan with Vasotec.  (R. 257-258.)

An FDNY WTC Monitoring and Treatment Visit Summary Form dated February 19, 2008 listed sinusitis and asthma as Plaintiff's WTC-related diagnoses. (R. 356.) Plaintiff also had hypertension, diabetes, and a high lipid profile. (*Id.*) Lab testing showed higher than normal blood glucose, cholesterol, and LDL cholesterol levels. (R. 278.) Diet and exercise were recommended. (R. 356.) An EKG showed a heart sinus rhythm within normal limits. (R. 279.) Pulmonary-function testing showed an FEV1 at 85% of the predicted value, interpreted as normal spirometry. (R. 280, 362.)

On September 8, 2008, Plaintiff returned for a visit with Dr. Dodaro. (R. 260-262.) Plaintiff complained of tinnitus, chronic sinus infection, allergies, and earache. (R. 260.) Dr. Dodaro noted that tinnitus was constant, causing severe annoyance and associated symptoms of hearing loss, difficulty concentrating, fluctuating frequencies, vertigo, and insomnia. (*Id.*) Plaintiff's allergies were chronic and of mild to moderate severity. (*Id.*) Plaintiff also experienced postnasal drip, and complained of asthma, pharyngitis, eczema, dizziness, headache, hives, hoarseness, infections, ear pain, reflux, cough, sinus pain, and reddened eyes. (*Id.*) On examination, Dr. Dodaro observed cerumen impaction and hearing sensorineural loss in both ears. (R. 261.) Dr. Dodaro performed a complete removal of cerumen impaction in both ears. (R. 262.) A respiratory exam showed no cough, no audible wheeze, regular respirations, and a normal respiratory effort. (R. 261-262.) A nose examination showed a deviated septum and moderate hypertrophy of the right and left turbinates. (R. 261.) A mouth examination showed poor dentition. (*Id.*) Dr. Dodaro diagnosed Plaintiff with chronic sensorineural hearing loss, chronic tinnitus, chronic impacted cerumen, chronic hypertrophy of the nasal turbinates, and chronic deviated nasal septum. (R. 262.) He prescribed Veramyst and Medrol, and ordered a follow up visit in three months. (*Id.*)

On February 20, 2009, Dr. Ann Marchesano, a physician with the FDNY, examined Plaintiff. (R. 313, 327.) Plaintiff was doing well on Advair, but still had sinus disease, congestion, and a hoarse voice that was worse in the morning. (*Id.*) Dr. Marchesano prescribed Astelin to be taken in addition to Rhinocort. (*Id.*) She recommended a GERD diet, started Plaintiff on Omeprazole, and authorized a visit to an ear, nose, and throat ("ENT") specialist. (*Id.*) Dr. Marchesano diagnosed Plaintiff with asthma/RADS, sinusitis, and gastroesophagitis. (*Id.*) An EKG showed a heart sinus rhythm within normal limits. (R. 273, 414.) A pulmonary-function test showed Plaintiff's FEV1 at 74% of the predicted value, which was interpreted as normal spirometry. (R. 274, 421.) Lab testing performed on the same date showed mildly abnormal urinalysis, higher than normal blood glucose levels, and higher than normal lipid profile. (R. 415.) A chest x-ray yielded normal results. (R. 412.)

On February 24, 2009, Dr. Mark Carney, an ENT allergy specialist, examined Plaintiff. (R. 342.) Plaintiff reported decreased hearing and ringing in his ear with no pain. (*Id.*) Plaintiff attributed his symptoms to his sinus problems. (*Id.*) Plaintiff reported mucous pressure, increased congestion, rhinitis, dyspnea, and constant sinus infections. (*Id.*) On physical examination, Plaintiff's lungs were clear to auscultation. (*Id.*) Plaintiff's nose had a deviated septum. (*Id.*) Dr. Carney observed hypertrophy of the turbinates, as well as dry mucosa. (*Id.*) Plaintiff's sinuses were within normal limits, but he had excess earwax in his left ear. (*Id.*) Plaintiff's ears were otherwise normal. (*Id.*) Dr. Carney opined that all of Plaintiff's chief complaints were related to his work at the WTC. (*Id.*) Dr. Carney diagnosed hearing loss, tinnitus, and chronic rhino/sinusitis. (*Id.*) He prescribed a saline nasal spray. (*Id.*) At this visit, Plaintiff reported that he quit smoking. (*Id.*)

## 2. Medical Evidence after Plaintiff's Date Last Insured (June 30, 2009)

On October 14, 2009, Plaintiff visited Dr. Marchesano. (R. 326.) Plaintiff complained of anxiety with heights and ongoing "sinus issues." (*Id.*) Dr. Marchesano noted Plaintiff was still smoking, and that he was resistant to stopping. (*Id.*) She recommended smoking cessation and counseling. (*Id.*) Dr. Marchesano administered a flu vaccine. (*Id.*) Dr. Marchesano diagnosed Plaintiff with asthma/RADS, sinusitis, and deferred a psychological diagnosis. (*Id.*)

On October 18, 2009, Dr. Prezant examined Plaintiff. (R. 324-325.) Plaintiff reported he had stopped smoking since April 2009, and that his snoring subsequently had decreased. (R. 324.) Plaintiff complained of a daily cough that produced mucous but no blood (hemptyosis). (*Id.*) Chronic sinus drip and congestion caused Plaintiff frontal headaches, which ceased when he cleared his nose. (*Id.*) Exposure to irritants and weather changes caused Plaintiff's cough and sinus drip to recur. (*Id.*) Plaintiff experienced no shortness of breath while resting or golfing, but climbing one flight of stairs caused difficulty breathing. (*Id.*) Dr. Prezant reported that Plaintiff's GERD had subsided, and that he had lost forty pounds. (*Id.*) Plaintiff rarely used Albuterol, which only helped with attacks in the morning. (*Id.*) Plaintiff stopped taking Advair three weeks prior to his visit with Dr. Prezant. (*Id.*) On examination, Plaintiff's lungs were clear, his throat was red, and his left sinuses were tender. (*Id.*) A pulmonary-function test report showed Plaintiff's FEV1 and FVC values respectively at 79% and 84% of the predicted values. (R. 271, 380). These results were interpreted as normal spirometry. (*Id.*) Plaintiff was taking medication for diabetes, high cholesterol, and for his liver. (R. 324.) Dr. Prezant continued Plaintiff's medications and authorized a full breath test and CT-scans of Plaintiff's chest, nose, lung, and sinuses. (R. 324-325.) Dr. Prezant diagnosed Plaintiff with sinusitis and deferred a

psychological diagnosis.  (R. 325.)  He noted that Plaintiff was considering reapplying for WTC disability.  (R. 324.)

On October 29, 2009, Plaintiff underwent a pulmonary-function test.  (R. 283-286, 367-370.)  The results showed Plaintiff's vital capacity was near the lower normal limit, primarily due to reduction of expiratory reserve volume.  (R. 368.)  Functional residual capacity and residual volume were increased indicating hyperinflation and air trapping.  (*Id.*)  A spirometry demonstrated reduction in FEV1 with reduced FEV1/FVC ratio and improvement in expiratory airflow function following application of a bronchodilator.  (*Id.*)  The impression was obstructive airway dysfunction with no significant changes in lung function compared to a prior test dated September 27, 2007.  (*Id.*)  The test administrator noted that Plaintiff provided excellent effort and cooperation, but that his uncontrollable cough "prevented achievement of expiratory plateau during almost all maneuvers."  (R. 286, 370.)

On October 29, 2009, Plaintiff underwent a CT-scan of his chest that revealed granulomatous disease, airway inflammation, and emphysema.  (R. 302-304, 381-382, 384, 408-410, 429-430.)  The scan revealed an ovoid nodule in the left lower lobe measuring eight millimeters.  (R. 304, 382, 410, 428.)  The nodule may have been post-inflamatory, but a follow-up study was advised to confirm the nodule's stability, unless other studies were available for comparison.  (*Id.*)  The CT-scan also showed cysts on the right kidney and liver, fatty infiltration of the liver, and coronary vascular calcifications.  (R. 302, 304, 382, 384, 408, 410, 428, 430.)  The report recommended a CT-scan of Plaintiff's chest, a cardiac stress test with imaging, and a kidney ultrasound.  (R. 302, 384, 408, 430.)  A subsequent CT-scan of Plaintiff's sinuses showed nasal septal deviation, minimal mucosal disease in scattered paranasal sinuses, and sinonasal

anatomic variants.  (*Id.*)   The report revealed mild sinusitis, and it was recommended that Plaintiff consult an ENT specialist if symptoms persisted.  (R. 306, 404.)

On December 6, 2009, Plaintiff underwent a pulmonary-function test, which showed an FEV1 at 74% of the predicted value.  (R. 270, 392.)  This result was interpreted as low vital capacity possibly due to restriction of lung volumes.  (*Id.*)  Plaintiff saw Dr. Prezant for an office visit on the same day.  (R. 323.)  Plaintiff had cut down smoking to four cigarettes per day, and was "ready to use [an] inhaler."  (*Id.*)  Plaintiff did not respond to Advair, and reported "occasional irritant reactions to dust, perfumes, etc."  (*Id.*)  Plaintiff's sinus congestion had improved with sinus saline, but did not respond to Rhinocort or Atrovent.  (*Id.*)  On examination, Plaintiff's lungs were clear, and there was mild tenderness in his sinuses.  (*Id.*)  Plaintiff's condition was "stable and improved."  (*Id.*)  Dr. Prezant discontinued Advair, and continued Combivent, nasal saline, Astelin, and Pulmicort.  (*Id.*)  He diagnosed Plaintiff with asthma/RADS and sinusitis, deferred a psychological diagnosis, and noted that a cardiovascular evaluation was pending.  (*Id.*)

On December 11, 2009, Plaintiff underwent a sonogram of his kidneys, which showed normal-sized kidneys and no shadowing stone or hydronephrosis.  (R. 299-300, 371-372, 393, 430-431.)  There was a dominant unilocular right renal cyst, which showed a calcium deposit or mural calcification.  (R. 300, 372, 393, 431.)  There was no obvious retroperitoneal node on the right side, though it was noted that a CT-scan evaluation "may be more sensitive for additional retroperitoneal findings."  (*Id.*)  It was recommended that Plaintiff visit his personal doctor.  (R. 299, 371.)  A maximal exercise treadmill test was negative.  (R. 394-402.)  Myocardial perfusion results were normal.  (R. 395, 433.)

On February 3, 2010, Plaintiff underwent a CT-scan of his chest. (R. 287-289, 363-365.) Compared to a previous CT-scan, this CT-scan report showed that the left lower lobe/fissural nodule was stable. (R. 289, 365.) No new or enlarged lung nodule was found. (*Id.*) The CT-scan revealed granulomatous disease, airway inflammation, and hepatic steatosis. (*Id.*)

On February 23, 2010, Dr. Pauis examined Plaintiff through the FDNY WTC Monitoring and Treatment program. (R. 427.) Plaintiff's lab testing showed higher than normal blood glucose, cholesterol, and LDL cholesterol levels. (R. 423-426, 266-269.) An EKG showed a heart rhythm within normal limits. (R. 437.) A pulmonary-function test showed an FEV1 at 76% of the expected value, which was interpreted as normal spirometry. (R. 438.) Dr. Pauis recommended a colonoscopy, and Plaintiff was advised to follow up with Dr. Prezant. (R. 427.)

On July 8, 2010, a lay analyst with the state agency medical consultant's office completed a Physical Residual Functional Capacity ("RFC") Assessment concluding that, through June 30, 2009, Plaintiff retained the ability to perform medium work. (R. 441-446.) The unsigned assessment found Plaintiff able to lift or carry fifty pounds occasionally, lift or carry 25 pounds frequently, stand or walk for a total of six hours in an eight-hour workday, and no exertional limitation in pushing or pulling. (R. 442.) These findings were based on Plaintiff's diabetes, COPD, spirometry, and cardiac testing. (*Id.*) The assessment noted Plaintiff's environmental restrictions of avoiding "even moderate exposure to fumes, odors, dust, gases, poor ventilation, etc." (R. 444.) The assessment indicated no hearing loss, and that cardiac testing and spirometry tests revealed "mild restriction." (*Id.*) The lay analyst concluded that Plaintiff's allegations were partially credible and that no objective medical evidence substantiated Plaintiff's allegations of severe reduction of activities of daily living. (R. 444-445.)

On September 17, 2011, Dr. Weiden completed a form entitled, "Treating Doctor's Patient Functional Assessment To Do Sedentary Work." (R. 157-160.) Notably, the findings in this report span the period October 12, 2002 to September 17, 2011. (R. 157.) Dr. Weiden specified that Plaintiff could stand or walk for less than two hours during an eight-hour day, and could sit for less than two hours in an eight-hour day. (*Id.*) Dr. Weiden indicated that, if required to do so, Plaintiff could lift or carry more than five pounds, but less than ten pounds, for no more than two-thirds of an eight-hour workday. (*Id.*) Plaintiff's symptoms included shortness of breath, chest tightness, wheezing, rhonchi (low-pitched, rattling sounds in the lungs), episodic acute asthma, episodic acute bronchitis, fatigue, and coughing. (R. 158.) Plaintiff suffered from acute asthma attacks precipitated by factors including upper respiratory infection, allergens, exercise, irritants, cold air and change in weather. (*Id.*) Dr. Weiden characterized the nature and severity of Plaintiff's attacks as "severe frequent," occurring three to six times monthly, and incapacitating Plaintiff for two to four days monthly. (*Id.*) Dr. Weiden noted that Plaintiff would need frequent breaks during the workday, and require an average of two or more sick days monthly. (*Id.*) He recommended Plaintiff avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, and chemicals. (R. 159.) Dr. Weiden indicated that Plaintiff's symptoms were severe enough to interfere with the attention and concentration necessary to perform even simple work tasks at least ninety percent of a workday, and that Plaintiff was incapable of tolerating "low stress" jobs. (*Id.*)

## C.    Vocational Expert ("VE") Testimony

At the hearing, the VE testified that Plaintiff's past work as a firefighter was a skilled job, requiring a very heavy exertional level. (R. 105.) The ALJ requested the VE to consider a

hypothetical individual of Plaintiff's age, education, work experience, and the following restrictions:

> lift and/or carry up to fifty pounds occasionally, 25 pounds frequently, stand and/or walk with normal breaks for a total of about six hours in an eight hour work day, sit with normal breaks for a total of about six hours in an eight hour work day, [with the environmental restrictions of] avoid[ing] even moderate exposure to dust, fumes, odors, gases, poor ventilation and other respiratory irritants, and [who needed to work in environments which do] not involve hazards such as machinery and heights.

(R. 105-106.)  The VE testified that there would be no jobs available at the medium level for such individual.  (R. 106.)  The critical factor was the Plaintiff's need to avoid even "moderate exposure" to fumes, odors, and irritants.  (*Id*.)

Having originally testified that no jobs at the medium level were available for a hypothetical individual with the qualifications listed above, the VE later testified that such a hypothetical individual would be able to work as a bagger in a supermarket and as a hand packer. (R. 108.)  The VE testified that the number of jobs available as a bagger in the national and local economies was 175,000 and 7,000, respectively.  (*Id.*)  However, in calculating the number of jobs available as a hand packer, the VE reduced the totals by fifty percent, to account for Plaintiff's environmental limitations.  In doing so, the VE testified that there were 40,000 such jobs in the national economy and 1,500 in the local economy.  (*Id.*)

When questioned by Plaintiff's attorney, the VE testified that the fifty percent reduction in the number of jobs available constituted a judgment call, based on the VE's work experience of over 30 years.  (R. 109-110.)  The VE testified that none of those jobs would be available to a hypothetical individual who was required to avoid all exposure to heat, cold, humidity, wetness, perfume, solvents, fumes, dust, and chemicals.  (R. 108.)  Additionally, since the maximum allowable absentee rate per month is one day for entry-level unskilled work, none of those jobs

would be available to a hypothetical individual who was absent due to illness three to six sick days per month. (R. 109.)

## DISCUSSION

### A. Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the

Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999) (quotations omitted).

**B.    Disability Claims**

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education and work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment

meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("the Listings"). *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. § 404.1520(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

## C.    The ALJ's Decision

On October 25, 2011, the ALJ issued a decision denying Plaintiff's claims. (R. 7-19.) The ALJ followed the five-step procedure in making his determination that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), with some additional environmental restrictions, and, therefore, was not disabled. (R. 13, 16.) At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since October 12, 2002, the alleged onset date, through June 20, 2009, the date last insured. (R. 12.) At the second step, the ALJ found the following severe impairments: COPD and diabetes mellitus. (*Id.*) At the third step, the ALJ concluded that Plaintiff's impairments, in combination or individually, did not meet or equal an impairment included in the Listings. (R. 12-13.)

At the fourth step, the ALJ found that Plaintiff could perform medium work as defined in 20 CFR § 404.1567(c), except that he must avoid moderate exposure to fumes, dust, odors, gases, and other respiratory irritants as well as hazards, machinery, and heights. (R. 13-14.) The ALJ found that Plaintiff was unable to perform his past relevant work as a firefighter, which was a heavy exertion position, because Plaintiff was limited to medium exertion work. (R. 14.)

19

The ALJ found that Plaintiff could "lift [twenty-five] pounds frequently and [fifty] pounds occasionally; stand, and/or walk for [six] hours in an eight-hour [work]day, [and] sit for six hours in an eight-hour [work]day." (*Id.*) As to Dr. Weiden's opinion that Plaintiff was capable of doing less than a full range of sedentary work, the ALJ found that "the substantial medical evidence of record contradicts this opinion" and, thus, assigned his opinion "little weight." (*Id.*) The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (*Id.*)

At the fifth step, "based on the testimony of the vocational expert . . . considering the claimant's age, education, work experience, and residual functional capacity" the ALJ found Plaintiff was "capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (R. 16.)

## D.      Analysis

The Commissioner moves for judgment on the pleadings, seeking affirmation of the denial of Plaintiff's benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled and that the factual findings are supported by substantial evidence. (*See generally* Def. Mem.) Plaintiff cross-moves for judgment on the pleadings, contending the ALJ incorrectly: (1) assigned "little weight" to Dr. Weiden's opinion under the treating physician rule; (2) discredited Plaintiff's statements as to his symptoms; and (3) ignored contradictory testimony from the VE regarding Plaintiff's ability to adjust to other work existing in the national economy. (*See generally* Pl. Mem.) Alternatively, Plaintiff seeks remand. (*See id.* at 13-14.)

Upon review of the record, the Court finds that the ALJ applied the correct legal standards and his decision is supported by substantial evidence. Plaintiff's arguments to the contrary are meritless.

### 1. Unchallenged Findings

The ALJ's findings as to steps one to three are unchallenged. (*See id*. at 13.) Upon a review of the record, the Court concludes that the ALJ's findings at steps one through three are supported by substantial evidence.

### 2. Plaintiff's RFC

#### a. The ALJ's RFC Assessment

The ALJ found that Plaintiff retained the RFC to perform medium work, with the additional restrictions that Plaintiff avoid "even moderate exposure to fumes, dust, odors, gases, and other respiratory irritants" and all "hazards, machinery, or heights." (R. 13-14.) Medium work involves lifting no more than fifty pounds, and frequently lifting or carrying objects weighing up to twenty-five pounds. 20 C.F.R. § 404.1567(c). Medium work also involves standing and/or walking for six hours in an eight-hour workday, and sitting for the remaining time. *See* SSR 83-10, 1983 WL 31251, at *6. "Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms." *Id*. Finally, "[i]n most medium jobs, being on one's feet for most of the workday is critical." *Id*.

Turning to this action, Plaintiff had the burden of proving that he was unable to perform medium work. *See Poupore v. Astrue*, 566 F. 3d 303, 305-06 (2d Cir. 2009) (explaining that at the fifth step, the Commissioner has the "limited burden" of showing "that there is work in the national economy that the claimant can do" and that the Commissioner "need not provide

additional evidence of the claimant's residual functional capacity"). During the relevant period (October 12, 2002 through June 30, 2009), there are no records indicating that Plaintiff was unable to perform medium duty work, other than the environmental restrictions noted by the ALJ. The ALJ was entitled to rely on the lack of findings regarding Plaintiff's physical capabilities in assessing his RFC. *See Dumas v. Schweiker*, 712 F. 2d 1545, 1553 (2d Cir.1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."); *accord Diaz v. Shalala*, 59 F. 3d 307, 315 (2d Cir. 1995) (declining plaintiff's request to remand for further proceedings to solicit evidence from plaintiff's physicians as to whether plaintiff could sit for prolonged periods because each of his physicians evaluated his physical capabilities and the ALJ was entitled to rely on the absence of that finding in determining that plaintiff could perform sedentary work).

Substantial evidence in the record supported the ALJ's RFC assessment. Notably, Plaintiff testified that, at the time he retired from full fire duty in October 2002, he felt fine. (R. 101.) There are no medical records indicating that he suffered from any physical impairments until June 2004, when he sought treatment for his asthma. In June 2004, Dr. Prezant noted that Plaintiff's lungs were clear, and that Plaintiff was working at that time. (R. 334.) In August 2004, Plaintiff's lungs were clear, and his asthma was classified as stable, except during periods of humidity. (R. 331.) In November 2004, his lungs were clear and his asthma, again was classified as stable. (R. 330.) Reports associated with these appointments indicate that Plaintiff was capable of full duty work. (R. 316-18.) A chest x-ray taken in April 2006 revealed normal results. (R. 347.) A September 2007 CT-scan of Plaintiff's chest revealed calcified nodules in Plaintiff's lungs (R. 265); however, a physical examination conducted the following month yielded normal results, except for coarse breathing sounds (R. 256). In February 2009, a chest x-

ray revealed normal results. (R. 412.) Plaintiff's lungs were clear, again, at a February 2009 examination. (R. 342.)

Additionally, medical records for some of the treatment that occurred after the relevant period supports the ALJ's RFC assessment. In October 2009, Plaintiff reported that he was using his Albuterol inhaler occasionally, and no longer used his Advair inhaler. (R. 324.) In December 2009, Plaintiff reported that respiratory irritants only "occasionally" caused reactions. (R. 323.) Dr. Prezant found that Plaintiff's lungs were clear and that his condition had improved and was stable. (*Id.*) Pulmonary testing revealed reduced FEV1 and FVC levels; however, the spirometries were interpreted as normal. (R. 271, 274, 280, 438.)

The record indicates that Plaintiff experienced problems with nasal and sinus congestion during the relevant period, as well as earaches and impacted earwax. However, none of the medical records establish that these problems impaired Plaintiff beyond the environmental restrictions the ALJ established. Further, Plaintiff indicated that his medications improved his nasal congestion after a few minutes (R. 330) and that his asthma attacks lasted no more than twenty minutes (R. 102). Accordingly, the Court finds that the ALJ's RFC assessment was supported by substantial evidence.

### b. Application of Treating Physician Rule to Dr. Weiden's Opinion

Plaintiff contends that the ALJ erred in assigning "little weight" to Dr. Weiden's September 17, 2011 RFC assessment. (Pl. Mem. at 2-9.) In particular, Plaintiff contends that, under the treating physician rule, the ALJ was required to explain his decision to assign "little weight" to Dr. Weiden's opinion in greater detail than simply stating that "the substantial medical evidence of record contradicts" Dr. Weiden's RFC assessment. (*Id.* at 6.)

An ALJ must give controlling weight to the opinion of a treating physician with respect to "the nature and severity of [a claimant's] impairment(s)."  20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F. 3d 126, 134 (2d Cir. 2000).  A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual."  *Schisler v. Bowen*, 851 F. 2d 43, 46 (2d Cir. 1988).  A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record."  *Burgess v. Astrue*, 537 F. 3d 117, 128 (2d Cir. 2008) (quotation marks and alteration omitted).  The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record."  *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)).  Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including:  "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Clark v. Comm'r of Soc. Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ must clearly state his or her reasons for not giving controlling weight to a treating physician's opinion.  *See Halloran v. Barnhart*, 362 F. 3d 28, 31-32 (2d Cir. 2004).

Turning to the instant action, the ALJ correctly assigned "little weight" to Dr. Weiden's opinion.  In a reported dated September 17, 2011, approximately two years after the relevant

period closed, Dr. Weiden provided an RFC assessment of Plaintiff. (R. 157-60.) Dr. Weiden indicated that the report covered the period October 12, 2002 to September 17, 2011. (R. 157.) Dr. Weiden opined that Plaintiff could stand or walk for less than two hours in an eight-hour workday; could sit for less than two hours in an eight-hour workday; could lift or carry five pounds, but not more than ten pounds, and for no more than two-thirds of an eight-hour workday; would need frequent breaks; and would need two or more sick days each month. (R. 157-58.) Dr. Weiden opined that Plaintiff must avoid *all* exposure to temperature changes, humidity, wetness, cigarette smoke, perfumes, soldering fluxes, cleaning solutions, fumes, odors, gases, dust, and chemicals. (R. 159.) He further opined that Plaintiff would be "off task" ninety percent of his workday and that he would be "incapable of even 'low stress' jobs." (*Id*.)

These findings are unsupported by the record. First, Dr. Weiden's RFC assessment is contradicted by Plaintiff's statements. For example, Plaintiff told the ALJ that, when he retired in 2002, which is also the alleged onset date for his DIB application, he "felt fine." (R. 101.) Indeed, he did not seek medical treatment until 2004. In 2004, Plaintiff indicated to his physicians that he was working, although he did not specify the nature of his work. (R. 334.) Indeed, Plaintiff submitted a form indicating that he worked on a biannual basis, six days at a time, from 2007 to 2009. (R. 186-87.) These admissions contradict Dr. Weiden's opinion that Plaintiff would be "off task" ninety percent of a work day and that Plaintiff was "incapable of even 'low stress' jobs." (R. 159.) Moreover, Plaintiff also indicated that, during the relevant period, and beyond, he continued to smoke cigarettes. (R. 256, 265, 326, 330, 334, 342.) These admissions stand in contrast to Dr. Weiden's opinion that Plaintiff could not work because he must avoid *all* exposure to, among other respiratory irritants, cigarettes. (R. 159.)

Second, Dr. Weiden's RFC assessment is contrary to the medical evidence in the record. There are no other medical records indicating that Plaintiff suffered from physical restrictions of any kind. With respect to the environmental restrictions, the medical records from other physicians do not support Dr. Weiden's severe restrictions. (R. 256, 265, 330-31, 342, 347.) Third, Dr. Weiden's RFC assessment is not substantiated by any clinical testing or objective findings. *Cf.* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.") Under these circumstances, the ALJ did not err in assigning Dr. Weiden's opinion "little weight." *See Veino*, 312 F. 3d at 588 (affirming the ALJ's decision to give little weight to the treating physician's opinion as that opinion was "contrary to the findings of the consultative examination" and not supported by "objective evidence" and it "was within the province of the ALJ" to resolve conflicting medical opinions).

Finally, the Court declines to remand this action for the ALJ to explain in greater detail his decision to assign "little weight" to Dr. Weiden's opinion. It is evident from the record that the ALJ's decision would not change on remand. Under these circumstances, remand is unnecessary. The Second Circuit has explained that "[w]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency reconsideration." *Zabala v. Astrue*, 595 F. 3d 402, 409 (2d Cir. 2010) (declining to remand even though the ALJ failed to satisfy the treating physician rule as the medical record that the ALJ overlooked would not have altered the ALJ's disability determination (quoting *Johnson v. Bowen*, 817 F. 2d 983, 986 (2d Cir. 1987))); *see also Halloran*, 362 F. 3d at 32-33 (declining to remand even when the ALJ failed to provide "good reasons" for the weight given to a treating physician's opinion).

### c.    Plaintiff's Credibility

Plaintiff contends that the ALJ erred in discrediting his statements regarding the severity of his symptoms.   (Pl. Mem. at 3-4, 6-7.)   The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability.  *See Taylor v. Barnhart,* 83 F. App'x 347, 350 (2d Cir. 2003).  However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "required to credit [Plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue,* 687 F.Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue,* 280 F. App'x 20, 22 (2d Cir. 2008)).  In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations.  *See Peck v. Astrue,* 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010).  First, the ALJ must consider whether there is a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged.  20 C.F.R. § 404.1529(b); S.S.R. 96-7p.  Second, if the ALJ finds that the individual suffers from a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work.  20 C.F.R. § 404.1529(c).

When the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of

the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

The Second Circuit has stated that "[i]f the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, [she] must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp. 2d at 435. When the ALJ neglects to discuss at length her credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether her decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Soc. Sec.,* 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding the case where the ALJ "considered some, but not all of the mandatory" factors).

Turning to the instant action, the ALJ found that Plaintiff's "medically determinable impairments reasonably could be expected to cause the alleged symptoms," but that his statements "concerning the intensity, persistence, and limiting effect of [his] symptoms" were not credible to the extent that they were inconsistent with the RFC. (R. 14.) Substantial evidence in the record supports the ALJ's credibility determination.

First, during the course of this litigation, Plaintiff contradicted himself regarding his capabilities. Plaintiff filed his DIB application in 2010, alleging that he became disabled on October 12, 2002. (R. 170, 194-95.) Yet, at his hearing, he testified that, when he retired from the FDNY in October 2002, he "felt fine," and that his impairments did not develop until later. (R. 101.) Moreover, Plaintiff admitted that he worked, at least intermittently, during the relevant period (October 12, 2002 through June 30, 2009). (R. 334, 186-87.) Plaintiff also claimed that

any exposure to respiratory irritants aggravated his conditions. (R. 102-04.) However, he continued to smoke cigarettes on a daily basis during the relevant period and beyond. (R. 256, 265, 326, 330, 334, 342.)

The medical evidence supports the ALJ's credibility determination as well. Plaintiff did not seek treatment for his impairments until 2004, and at that time, denied taking any medications for his impairments. (R. 334.) Subsequently, Plaintiff's asthma stabilized with use of Advair and Albuterol. (R. 330-32.) Plaintiff continued to complain about nasal and sinus congestion. (R. 330-31.) However, there were no further reports regarding Plaintiff's treatment for his impairments until September 2007, nearly five years after the alleged onset date of October 12, 2002. (R. 343.) It was not until after the relevant period closed that Plaintiff complained of difficulty breathing from climbing a flight of stairs. (R. 324.) But, at the same time, Plaintiff did not experience breathing problems when walking or golfing. (*Id.*) Notably, he denied any other medical issues. (*Id.*) For all of these reasons, the ALJ did not err in discrediting Plaintiff's statements regarding the severity of his symptoms.

### d. ALJ's Reliance on VE

Plaintiff contends that the ALJ ignored the VE's initial finding that no work existed that an individual with an RFC for medium work with the environmental restriction of avoiding even moderate exposure to respiratory irritants could perform. (Pl. Mem. at 9-10.) Plaintiff is correct that, after this initial testimony, the ALJ pressed the VE about various positions that an individual with Plaintiff's RFC could perform. (R. 105-08.) Ultimately, the VE testified that such an individual could work as bagger in a supermarket or a hand packer. (R. 108.) The ALJ was entitled to rely on the VE's testimony in reaching his decision. *See* 20 C.F.R. § 404.1566(e) ("If the issue in determining whether you are disabled is whether your work skills can be used in

other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist.")  Thus, the ALJ's decision was supported by substantial evidence.

Plaintiff further contends that the ALJ ignored the VE's finding that there were no jobs available for an individual with an RFC for medium work with the environmental restriction of avoiding all exposure to respiratory irritants.  (Pl. Mem. at 10-12.)  At the hearing, Plaintiff's attorney solicited this testimony from the VE (R. 108-09), which was based solely on Dr. Weiden's opinion (R. 159).  As set forth above, the ALJ did not err in assigning "little weight" to Dr. Weiden's RFC assessment, and, thus, did not err in ignoring testimony from the VE based solely on Dr. Weiden's RFC assessment.  Accordingly, the Court concludes that the ALJ's decision finding Plaintiff was not disabled was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted.  Plaintiff's cross-motion for judgment on the pleadings is denied.  The appeal is dismissed.

SO ORDERED.

Dated: Brooklyn, New York
      September 8, 2014

/s/
DORA L. IRIZARRY
United States District Judge
